## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **SEATTLE HOUSE LLC,** <br> 470 Olde Worthington Road, Suite 100 <br> Westerville, Ohio 43082, <br><br> individually and on behalf of all others <br> similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> **THE CITY OF DELAWARE, OHIO**, <br> 1 South Sandusky Street <br> Delaware, Ohio 43015, <br><br> Defendant. | **Civil Action** 2:2020-cv-03284 <br><br> **Judge** _____ <br><br> **Magistrate Judge** _____ <br><br><br> **JURY DEMAND ENDORSED HEREON** |

---

## CLASS ACTION COMPLAINT

---

Plaintiff Seattle House, LLC ("Plaintiff" or "Seattle House"), on behalf of itself and all others similarly situated, for its Class Action Complaint against Defendant the City of Delaware, Ohio (the "City" or "Delaware"), avers and alleges:

## I. INTRODUCTION

1.     The City of Delaware has amassed millions of dollars through illegal impact fees at the expense of affordable housing.  Under the guise of "capacity fees," the City purports to charge fees to defray the cost of each new development's use of the City's water and sewer systems.  In reality, the City simply demands that completely arbitrary amounts be paid that have nothing to do with the actual cost of capacity a new development adds to the systems.

2.     The sad truth is that the City has known for years that its illegal impact fees are a barrier to affordable housing which disproportionately impact racial minorities.  Seattle House has

raised and re-raised these issues with City officials for months. Instead of fixing the imbalances, the City protects the nearly all-white status quo and ignores affordable fee alternatives that would diversify the City.

3.    The City purports to calculate its capacity fees on a new development's water and sewage use. Yet, the City's own internal 2008 analysis of actual utilization shows that the City has known for many years that its usage estimates are grossly exaggerated. For example, the capacity fees for a two-bedroom apartment assume that the apartment will use 300 gallons of water per day ("GPD"). The City's 2008 internal analysis showed that a two-bedroom apartment actually used only approximately 93.9 GPD. The water and sewage fees therefore overstate the capacity necessary for new two-bedroom apartments by more than three-times the actual capacity used. Moreover, for non-residential developments, the City bases these fees on non-residential developments' *actual* use, but refuses to do the same for residential developments.

4.    Likewise, the City based the fees on projected costs for additions to capacity at the City's water treatment plant and the Upper Olentangy Water Reclamation Center. The fee calculations assumed the City would pay approximately $7.3 million per year in loan payments for improvements to capacity. In reality, the City obtained much more favorable terms on those loans. The City pays only approximately $1.8 million per year for those loans and spends far less overall per year on capacity-related projects than was projected.

5.    In short, the fees do not reflect the amount of water and sewer a new home uses. Nor do the fees pay for the debt they were created to service.

6.    The City's Municipal Code requires the City to evaluate and update the capacity fees each year. Yet, in violation of its own Code, the City has not evaluated or updated its capacity

fees since 2006 – save the City's 2008 internal analysis which showed the fees were grossly excessive.

7.     Worse, the City was warned in 2002 that these capacity fees would stifle the development of affordable housing.  The capacity fees, which are $11,035 for a single-family home, can be absorbed much more easily for a $550,000 home than a $180,000 home.  Such fees add significant expense to affordable housing projects that, by necessity, have very tight budgets. These exorbitant capacity fees make it economically infeasible to build affordable housing.  When these fees are scaled for an entire community, the risk of failing to recover such fees discourages builders from building homes for low-income earners.  This lack of affordable housing has disproportionately impacted racial minorities whose incomes are less than their white counterparts.

8.     Despite its location within Central Ohio, which has experienced exploding growth in diversity and foreign immigrants, Delaware remains a nearly all-white city[1]:



9.     Seattle House developed a 240-unit apartment community comprised of one- and two-bedroom apartments.  The City forced Seattle House to pay more than $1.9 million in illegal

---

[1] "Race and Ethnicity" of Delaware, Ohio.   Available  https://datausa.io/profile/geo/delaware-oh/#demographics (depicting 2017 diversity statistics).

capacity fees despite that Seattle House's apartments would use far less capacity than the City charged Seattle House – $1.2 million less.

10. The City's arbitrary capacity fee scheme has cost Seattle House and others similarly situated millions of dollars while exacerbating the City's affordable housing crisis to the detriment of racial minorities. Seattle House therefore seeks injunctive, monetary, and declaratory relief for itself and others similarly situated for the City's violation of the Fair Housing Act, the United States and Ohio Constitutions, and the City's own Municipal Code.

## II. JURISDICTION AND VENUE

11. This action arises under the Constitution and laws of the United States.

12. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 1367, and 2201.

13. Pursuant to R.C. § 733.59, as a City taxpayer, Seattle House is authorized to institute this action in its own name.

14. Venue in this Court is proper under 28 U.S.C. § 1391(b) as this is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

15. Additionally, further recourse to state procedures would be futile, and/or a final decision is not required by existing law.

## III. PARTIES

16. Seattle House is an Ohio limited liability company with its principal place of business in Westerville, Ohio. Seattle House is the record owner of Parcel No. 51944401001001 located in the City of Delaware, Ohio (the "Property").

17. The City of Delaware is a chartered municipal corporation and body politic operating under the laws of the State of Ohio and is situated wholly within Delaware County, Ohio.

## IV.  CLASS ALLEGATIONS

18.     Plaintiff brings this action on its behalf, and as a class action, pursuant to Rule 23(A), (B)(2) and (B)(3) of the Federal Rules of Civil Procedure.  Plaintiffs bring this action on behalf of the following classes and subclasses:

   a.  A nationwide Rule 23(b)(3) class including all persons – including, but not limited to, landowners and developers – upon whom the City imposed the water and sewer capacity fees and from whom the City collected the fees.

   b.  A subclass including all persons – including, but not limited to, landowners and developers – upon whom the City imposed the water and sewer capacity fees for residential development and from whom the City collected the fees for residential development.

19.     Upon completion of class discovery, Plaintiff reserves the right to add to or amend the class definitions.

20.     The class members are so numerous and geographically diverse, that joinder is impracticable.

21.     There are questions of fact and law common to class members that predominate over questions affecting individual members, which include, but are not limited to the following:

   a.  Whether the City's fees reduced the availability of affordable housing resulting in a disparate impact on racial minorities;

   b.  Whether the City's fees distinguish between residential and non-residential properties without a rational basis;

   c.  Whether the City's fees are arbitrary and capricious;

     d.    Whether the City has been unjustly enriched by imposing and collecting the fees on the class members;

     e.    Whether the fees violate Article XVIII, Section 4 of the Ohio Constitution;

     f.    Whether the City violated City Code Sections 913.20(g) and 913.21(g).

22.    The claims of Plaintiff are typical of the claims of other class members, and Plaintiff has no interests that are adverse or antagonistic to the interests of the other class members.

23.    Plaintiff will fairly and adequately protect the interests of other class members. Plaintiff is committed to prosecuting this class action and have retained competent counsel experienced in litigation of this nature.

24.    Plaintiff envisions no unusual difficulty in the management of this action as a class action.  For all of the foregoing reasons, a class action is superior to the other available methods for the fair and efficient adjudication of this action.

**V.**    **FACTUAL BACKGROUND**

    **A.**    **The City Develops a Utility Fee Structure That Results in Massive Revenues to the City at the Expense of Affordable Housing.**

25.    In the early 2000s, the City changed its water and sewer capacity fee structure despite knowing that the change would have a detrimental impact on the availability of affordable housing.  While the City's Code requires the City to re-evaluate the fee structure annually, the City refused to do so.  Instead, because the new fee structure generated massive revenues for the City, the City has left the fee structure in place for fourteen years, resulting in an affordable housing crisis.

    **1.**    **The City knows that increasing capacity fees will drastically reduce affordable housing in the City.**

26.    Prior to 2002, the City charged developers a fixed, $300.00 tap-in fee for water and sewer.

27.     In 2002, however, the City considered substantially increasing its water and sewer capacity fees to finance the cost of a plant expansion project.  For residential properties, the change would increase capacity fees by approximately $3,600 to $4,000 per household.

28.     The Building Industry Association of Central Ohio (the "BIA") sent the City a letter in April 2002 warning the City that "fee increases between $3,600 to $4,000 will have a dramatic impact on housing affordability in the City of Delaware."   The BIA informed the City that the proposed increase "will be much greater than most jurisdictions that are experiencing the number of moderately priced housing starts in the region," such as suburbs in Franklin County.  A true and accurate copy of the letter is attached hereto as Exhibit A.

29.     The City ignored the BIA's warnings and increased the fees in 2002.

### 2.     The City solicits a study to support its decision to increase capacity fees in 2006.

30.     In 2006, the City hired Floyd Browne Group ("FBG") to perform an evaluation of the City's water and sewer capacity fee structure.

31.     FBG recommended that the City adopt a capacity fee structure based on what is called an incremental cost method.  FBG proposed a capacity fee structure designed to require each new user to pay its share of capacity that would be added to the water treatment plant and to the Upper Olentangy Water Reclamation Center.

32.     FBG therefore projected the annual principal and interest costs for the expanded capacity over a 20-year period and divided that amount by the estimated capacity that would be added to the systems.

33.     FBG estimated the amount of water that a single-family home would use each day to calculate the capacity that would be needed to service the home.  FBG acknowledged that estimated usage of a so-called equivalent dwelling units ("EDU") ranged from 200 to 500 gallons

of water per day in Ohio. Yet somehow, FBG divined that Delaware should assume that one single-family home would use near the top-end of the range, 400 gallons per day. FBG then applied rough approximations for multi-family structures based on the number of bedrooms or Single Family Equivalent ("SFE") values.

34.     FBG recommended that the sewer capacity fee be structured to pay $38.6 million over 20 years at 6% interest, or $3,365,324 per year. Further, based on FBG's estimates, the City would allocate this annual obligation among 625 EDUs per year. Dividing the estimated annual debt by the estimated additional EDUs per year, FBG recommended charging $5,385 per EDU for the City's sewer capacity fee.

35.     Additionally, FBG recommended that the water capacity fee be structured to pay $46 million over 20 years at 6% interest, or $4,010,490 per year. This annual obligation would be allocated among FBG estimated 750 EDUs per year. Dividing the estimated annual debt by the estimated additional EDUs per year, FBG recommended charging $5,350 per EDU as a water capacity fee.

### 3.     The City adopts FBG's recommendations.

36.     In 2006, the City adopted Ordinance No. 06-32, which increased the City's sewer capacity fee (the "Sewer Fee"). As set forth in Municipal Code § 917.21, the Sewer Fee is calculated as follows:

a.     One EDU is equal to 400 gallons per day.

b.     The Sewer Fee is $5,385 per EDU.

c.     All single-family residential properties are assigned one EDU.

d.     All multi-family residential properties are assigned an EDU multiple calculated by multiplying the number of multi-family residential units by

the Single Family Equivalent ("SFE"), including: (1) 1-bedroom is .63 SFE; (2) 2-bedroom is .75 SFE; (3) 3-bedroom is .88 SFE; and (4) 4+ bedrooms is 1.0 SFE.

e.    Non-residential properties are assigned an EDU based on the properties' estimated consumption. The EDU multiple is reviewed for non-residential properties twelve months after occupancy to determine whether the estimated consumption was accurate. If the EDU was overestimated, the owner will receive a refund.

37.    The City also adopted Ordinance No. 06-33, increasing the City's water capacity fee (the "Water Fee") (together, the Sewer Fee and the Water Fee are the "Fees"). As set forth in Municipal Code § 913.20, the Water Fee is calculated as follows:

a.    One EDU is equal to 400 gallons per day.

b.    The Water Fee is $5,650 per EDU.

c.    All single-family residential properties are assigned one EDU.

d.    Just as with the Sewer Fee, all multi-family residential properties are assigned an EDU multiple calculated by multiplying the number of multi-family residential units by the SFE, including: (1) 1-bedroom is .63 SFE; (2) 2-bedroom is .75 SFE; (3) 3-bedroom is .88 SFE; and (4) 4+ bedrooms is 1.0 SFE.

e.    Non-residential properties are assigned an EDU based on the properties' estimated consumption. The EDU multiple is reviewed for non-residential properties twelve months after occupancy to determine whether the

estimated consumption was accurate.  If the EDU was overestimated, the owner will receive a refund.

38.     The City's Municipal Code requires the City to evaluate and update the Fees annually.  *See* Municipal Code §§ 913.20(g), 917.21(g).

39.     The fee structure adopted in 2006 remains in effect today.

**4.     The City's own analysis confirms that it is significantly overcharging multi-family residential complexes.**

40.     In May 2008, in response to a request by a commercial developer, the City Finance Director, Dean Stelzer, analyzed the accuracy of the City's Fees for multi-family residential housing in a memorandum to City Manager R. Thomas Homan (the "Memo").

41.     The Memo demonstrated that the actual average daily consumption for multi-family residential units is substantially less than the amounts assumed when calculating the Fees.

42.     For example, the City assumes that a 2-bedroom unit in a multi-family residential complex will use .75 of one EDU, which equates to 300 gallons of water per day.  However, when the City analyzed the actual utilization at Forest Brooke Apartments, which consist entirely of 2-bedroom units, it only averaged 93.9 gallons of water per day, or 0.23 of one EDU.[2]

43.     The City's analysis of other apartment complexes showed similar results.

44.     Yet, the City did not act on its analysis or update its Fees to reflect its own analysis.

**5.     The City has made no effort to evaluate or update the capacity fee structure because the Fees generate massive revenues for the City.**

45.     The Fees as calculated by FBG were designed in 2006 to defray approximately $7.4 million in annual debt for specific capacity improvement projects.

---

[2]  As set forth in the Memo, the "Average monthly Consumption per unit" of the two-bedroom apartments at Forest Brooke was "3.764 ccf."  Each centum cubic foot ("ccf") of water equals 748.052 gallons. Thus, to convert 3.764 ccf/month to gallons/day, multiply 3.764 by 748.052, then divide by 30 days (3.764*748.052/30 = 93.9).

46.     Currently, however, the City pays far less than $7.4 million annually on this debt.  Rather, in 2019, the City paid $886,727 in principal and interest for the improvements to the Upper Olentangy Water Reclamation Center and $918,376 in principal and interest for improvements to the water treatment plant.  Thus, the City only paid a total of $1.8 million – only 24 percent of the projection used to substantiate the Fees.

47.     For these reasons, it would be prudent for the City to update and evaluate the capacity fee structure.

48.     Indeed, the City's Code requires the City to update and evaluate the capacity fee structure annually.  *See* Municipal Code §§ 913.20(g) (Water Capacity Fees), 917.21(g) (Sewer Capacity Fees).

49.     Yet, the City concedes that it has failed to follow its own Code.

50.     In a letter dated February 24, 2020, and in response to a public records request, Darren Shulman, Delaware City Attorney, stated "[c]urrent capacity fees are based on the [2006] Floyd Browne Group report we have previously provided.  **The City has not undertaken an update to its water or sanitary sewer service capacity fees since the adoption of the updates in 2006 and therefore have no records reflecting evaluation of an update**.  The city has no comparison of note with other municipal utilities.  The City's fees are based on the findings of the report and we do not base our fees on the fees charged in any other market." (Emphasis added.)

51.     The City Attorney stated, "No analysis has been done of single-family dwelling unit's actual usage of water or actual demand from water."  A true and accurate copy of the City Attorney's February 24, 2020 letter is attached as Exhibit B.

52.     The City has not updated or evaluated the capacity fee structure because the Fees have resulted in substantial revenues for the City.  According to the City of Delaware 2020 Budget,

capacity fees are one of the City's "major sources of revenue."

53. Despite being limited to developers of new developments in the City, the City's budget highlights that "Impact fees & Capacity fees"[3] are the City's third-highest source of revenues, accounting for more than $9.9 million last year:



6. **The City's exorbitant Fees have caused an affordable housing crisis.**

54. In exchange for state and federal funding, the City certified that it would conduct its activities in accordance with state and federal civil rights provisions related to furthering fair housing.

55. However, the City's imposition of the Fees on developers has resulted in an affordable housing crisis.

56. The Fees make it economically infeasible for developers to build multi-family residential properties for persons with lower incomes or affordable housing in general.

---

[3] In addition to the Fees, new developments must also pay other impact fees such as a residential impact fee of $366 per new house. The $9.9 million in the City's budget includes "revenue" from the Fees and other impact fees.

57.     Indeed, in a 2014 City of Delaware Economic Development Plan, the City freely acknowledged that the City had "[h]igh water and sewer capacity fees" such that they were "challenging" for development and considered "weaknesses" to future development.

58.     There is a real need for affordable housing in the City of Delaware. Generally, a household is considered to be cost overburdened if the household is paying more than 30% of income to housing. In Delaware County, which includes the City, 22.3% of owners and 40.3% of renters are cost overburdened.[4] This reflects a significant shortage of affordable housing in Delaware County and in the City.

59.     Further, racial minorities are disproportionately impacted by the lack of affordable housing.

60.     The Ohio Housing Needs Assessment report by the Ohio Housing Financing Agency notes that "[f]or many reasons, including both de facto and de jure segregation, racial and ethnic minorities are often geographically concentrated and have substantially different housing experiences than non-Hispanic whites . . . Overall, the median income of households headed by non-hispanic whites ($53,074) is nearly twice that of African-Americans ($28,003); all racial and ethnic minorities, except Asians, have incomes substantially below those of the majority."[5]

61.     The Benchmarking Central Ohio 2019 study performed by the Columbus Foundation reported that in the greater Columbus metropolitan area, which includes the City, the median household income for White residents was $69,985 while the median household income

---

[4] Vogt Strategic Insights, "Analysis of Housing Need for the Columbus Metropolitan Statistical Area," *available at* http://www.biahomebuilders.com/aws/BIA/asset_manager/get_file/276766?ver=3762.

[5] The Ohio Housing Finance Agency, "The Ohio Housing Needs Assessment, Technical Supplement to the 2018 Annual Plan" *available at* https://ohiohome.org/news/documents/2018-HousingNeedsAssessment.pdf.

for Black or African American and Hispanic or Latino residents was $39,898 and $45,965, respectively.[6]

62.     The City's Fees have significantly increased the costs for developers who build affordable housing; therefore, the increased costs from the City's Fees resulted in less affordable housing in the City.   Racial minorities make up a disproportionate share of lower-income households that rely on affordable housing and have been and continue to be disparately impacted by the Fees.

**B.     In 2019, the City Imposed the Arbitrary, Capricious, and Unlawful Fees on Plaintiff.**

63.     Plaintiff developed the Seattle House Apartments on the Property, a multi-family residential community consisting of 240 one- and two-bedroom apartments.

64.     In 2019, Plaintiff received approval from the City for the final development plan for the Seattle House Apartments, including 60 one-bedroom apartments, 180 two-bedroom apartments, and a clubhouse.

65.     Thereafter, in order to obtain permits to tap into the City's water and sewer lines, the City imposed the arbitrary, capricious, and unlawful Fees on Plaintiff, totaling $1,917,883.00.

   a.  The City charged Plaintiff $981,970.00 in Water Fees.

   b.  The City charged Plaintiff $935,913.00 in Sewer Fees.

66.     Plaintiff disputed these amounts.  Plaintiff retained an independent third party to evaluate the actual utilization of a 72-unit apartment community.  The actual utilization for that community was only 104.8 GPD (0.262 of one EDU) – a result corroborating the City's own 2008 analysis.  Thus, even assuming the exaggerated fees of $5,385 and $5,650 per one EDU are

---

[6] The Columbus Foundation, "Benchmarking Central Ohio 2019," *available at* https://columbusfoundation.org/ umbraco-media/5433/benchmarking-central-ohio-2019.pdf.

appropriate, which they are not, applying a usage rate of 0.262 EDU would amount to $355,272 in Water Fees and $338,609 in Sewer Fees or a total of $693,881. The City therefore overcharged Plaintiff by well more than $1.2 million. The City refused to accept these figures.

67.　　Nor did the City apply to Seattle House the same true-up the City applies to non-residential developments. *See* City Code §§ 913.20(c)(3) and 917.21(c)(3). That is, Plaintiff would pay the $1,917,883 in Fees upfront, but after 12 months of occupancy, the Fees would be adjusted, or trued-up, based on the Seattle House's actual utilization. Indeed, users' utilization rates are now available in the City on a near real-time basis.

68.　　Plaintiff, by and through its agent Metro Development II, LLC, paid the Fees in August 2019.

69.　　In order to remedy the constitutional defects set forth herein, Plaintiff made a written demand on the City's law director on May 18, 2020. The law director declined to seek an injunction against the City's imposition, collection, or retention of the Fees.

70.　　Because the City has yet to remedy the violations identified in the written demand, Plaintiff is filing this action pursuant to R.C. § 733.60. Plaintiff is giving security, concurrently with the filing of this Complaint, for the cost of the proceeding.

## VI.　CLAIMS FOR RELIEF

### COUNT ONE:
### VIOLATION OF THE FAIR HOUSING ACT OF 1968
### (ON BEHALF OF PLAINTIFF AND CLASS MEMBERS)

71.　　Plaintiff restates the foregoing paragraphs as if fully rewritten herein.

72.　　The City is subject to the Fair Housing Act of 1968 (the "FHA").

73.　　The FHA prohibits discrimination on the basis of race, color, or national origin in the terms, privileges, or conditions of the sale or rental of a dwelling, and in the provision of

services of facilities in connection therewith.  The FHA also prohibits enactment of facially neutral ordinances or policies that have a disparate impact on the basis of race, color, or national origin.

74.     While the Fees may appear to be facially neutral, the Fees have a discriminatory impact on racial minorities in the following manner:

        a.     There is a shortage of affordable housing in the City.

        b.     Racial minorities make up a disproportionate share of lower-income households who rely on affordable housing.

        c.     The Fees make it economically infeasible to develop affordable housing in the City.

        d.     The Fees drastically reduce development of affordable housing in the City, such that there is a very real lack of affordable housing in the City.

        e.     The lack of affordable housing in the City has a disproportionate effect on racial minorities.

75.     The City's imposition of the Fees on developers, including Plaintiff and the class members, does not further a legitimate bona fide governmental interest and alternative courses of action, yielding lesser discriminatory impacts, are available to the City.

76.     Because the Fees violate the FHA, Plaintiff and the class members are entitled to an injunction to prohibit the City from imposing and/or collecting its Fees on properties owned or managed by Plaintiff and the class members, compensatory damages and restitution of unlawful Fees paid to the City, and attorneys' fees and costs.

**COUNT TWO:**
**42 U.S.C. § 1983 – DENIAL OF EQUAL PROTECTION**
**(ON BEHALF OF PLAINTIFF AND CLASS MEMBERS)**

77.     Plaintiff restates the foregoing paragraphs as if fully rewritten herein.

78.     Plaintiff and the class members are entitled to equal protection of the laws pursuant to the Fourteenth Amendment to the United States Constitution.

79.     The City unconstitutionally differentiates between residential and non-residential properties in the following manner:

      a.  The City differentiates between residential properties and non-residential properties in the City's calculation and imposition of the Fees.

      b.  Any possible basis of the City's distinction between residential properties and non-residential properties is not based on distinguishing characteristics which are relevant to the interest that the City has authority to implement.

      c.  The City has no rational basis for the discriminatory treatment of residential properties.

      d.  The classification made by the City is not rationally related to the purpose of the rule imposed by the City.

      e.  Accordingly, developers of residential properties, including Plaintiff and the class members, have suffered and will suffer from the City's unequal treatment of the law.

80.     Because the imposition of the discriminatory Fees violate the Plaintiff's and the class members' right to equal protection of the laws pursuant to the Fourteenth Amendment to the United States Constitution, Plaintiff and the class members are entitled to compensatory damages and attorneys' fees.

## COUNT THREE:
## 42 U.S.C. § 1983 – DEPRIVATION OF SUBSTANTIVE DUE PROCESS
## (ON BEHALF OF PLAINTIFF AND CLASS MEMBERS)

81.     Plaintiff restates the foregoing paragraphs as if fully rewritten herein.

82.     Plaintiff and the class members are entitled to substantive due process under the Fifth and Fourteenth Amendments to the United States Constitution.

83.     The City has deprived Plaintiff and the class members of their property interests under color of law and without due process of law.

84.     Plaintiff has a protected property interest in the Property and Plaintiff's funds, and the class members have protected property rights the class members' properties and funds.

85.     The City has burdened Plaintiff's Property and the class members' properties with arbitrary, capricious, and irrational Fees that are in violation of the City's own Code.

86.     The City has arbitrarily and capriciously required developers and landowners to pay the Fees which neither reflect the actual capacity of water and sewer infrastructure new developments will add to the water and sewer systems, nor the actual costs the City has incurred for the construction of such infrastructure.

87.     The City's imposition of the Fees on Plaintiff and the class members has deprived Plaintiff and the class members of their right to substantive due process under the Fifth and Fourteenth Amendments to the United States Constitution.

88.     Because the imposition of the arbitrary, capricious, and irrational  Fees violate the Plaintiff's and the class members' right to due process of the laws pursuant to the Fifth and Fourteenth Amendment to the United States Constitution, Plaintiff and the class members are entitled to compensatory damages and attorneys' fees.

**COUNT FOUR:**
**UNJUST ENRICHMENT**
**(ON BEHALF OF PLAINTIFF AND CLASS MEMBERS)**

89.     Plaintiff restates the foregoing paragraphs as if fully rewritten herein.

90.     The City imposed the Fees upon Plaintiff and the class members.

91.     The Fees were arbitrary, capricious, and unlawful.

92.     Plaintiff and the class members paid the Fees.

93.     The City has been unjustly enriched by obtaining the arbitrary, capricious, and unlawful Fees from Plaintiff and the class members. It would be unjust and inequitable to allow the City to retain the Fees.

94.     The City is not immune from liability for unjust enrichment claims. *See, e.g., Thompson v. City of Oakwood*, 307 F. Supp. 3d 761, 778 (S.D.Ohio 2018) (applying Ohio law and granting plaintiffs summary judgment against municipality for unjust retention of illegal fees).

95.     The doctrine of unjust enrichment requires that the City make restitution to Plaintiff and the class members of the amounts which the City has been unjustly enriched at Plaintiff's and the class members' expense.

**COUNT FIVE:**
**VIOLATION OF ARTICLE XVIII, SECTION 4 OF THE OHIO CONSTITUTION**
**(ON BEHALF OF PLAINTIFF AND CLASS MEMBERS)**

96.     Plaintiff restates the foregoing paragraphs as if fully rewritten herein.

97.     Pursuant to Article XVIII, Section 4 of the Ohio Constitution, "Any municipality may acquire, construct, own, lease and operate within or without its corporate limits, any public utility the product or service of which is or is to be supplied to the municipality or its inhabitants, and may contract with others for any such product or service. The acquisition of any such public utility may be by condemnation or otherwise, and a municipality may acquire thereby the use of, or full title to, the property and franchise of any company or person supplying to the municipality or its inhabitants the service or product of any such utility."

98. Pursuant to Article XVIII, Section 4 of the Ohio Constitution, a municipality may only impose a capacity fee on new users of a utility so long as the capacity fee is fair, reasonable, and bears a substantial relationship to the cost of providing the services to those new users.

99. The City is subject to Article XVIII, Section 4 of the Ohio Constitution.

100. The Fees violate Article XVIII, Section 4 of the Ohio Constitution because the Fees are not fair, are unreasonable, and do not bear a substantial relationship to the cost of providing services to new users.

101. The City must therefore refund the Fees to Plaintiff and the class members.

**COUNT SIX:**
**DECLARATORY JUDGMENT – VIOLATION OF THE CITY CODE**

102. Plaintiff restates the foregoing paragraphs as if fully rewritten herein.

103. City Code Section 913.20(g) states that "[t]he [water] capacity fees will be evaluated and updated annually."

104. The City has not evaluated or updated the City's water capacity fees each year since 2006.

105. City Code Section 917.21(g) states that "[t]he [sewer] capacity fees will be evaluated and updated annually."

106. The City has not evaluated or updated the sewer capacity fees each year since 2006.

107. Plaintiff is entitled to a declaration that the City violated City Code Section 913.20(g).

108. Plaintiff is entitled to a declaration that the City violated City Code Section 917.21(g).

**VII.  PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Seattle House, LLC seeks:

A. A preliminary and permanent injunction pursuant to R.C. § 733.56 and the Court's equitable powers, prohibiting the City from continuing to impose, charge, collect, or retain Fees on properties owned or managed by Plaintiff and the class members;

B. A declaration that the Fees are illegal and violate the U.S. and Ohio Constitutions;

C. A declaration that the City violation City Code Sections 913.20(g) and 917.21(g);

D. Compensatory damages;

E. Pre- and post-judgment interest;

F. Attorney's fees and costs pursuant to 42 U.S.C. § 1988 and R.C. § 733.61; and

G. Any other declarative, injunctive or other equitable relief this Court deems just and appropriate.

Respectfully submitted,

Vorys, Sater, Seymour and Pease LLP

/s/ *Joseph R. Miller*
Joseph R. Miller (0068463), *Trial Attorney*
Christopher L. Ingram (0086325)
Arryn K. Miner (0093909)
Elizabeth S. Alexander (0096401)
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1008
Phone: (614) 464-6400
Fax: (614) 719-4630
jrmiller@vorys.com
clingram@vorys.com
akminer@vorys.com
esalexander@vorys.com

*Counsel for Plaintiff Seattle House, LLC*

## **JURY DEMAND**

Plaintiffs requests a trial by jury on all issues so triable.

*/s/ Joseph R. Miller*
Joseph R. Miller